UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CEVDET AKSÜT VE OĞULLARI KOLL. STI, | Civil Action No. |
| Plaintiff, | |
| | **COMPLAINT** |
| -against- | |
| HUSEYIN CAVUSOGLU, | |
| Defendants. | |

**INTRODUCTION**

1. This is an action for fraud, piercing the corporate veil and breach of fiduciary duty, among others things, against the principal and sole owner of a New Jersey corporation who used a shell corporation as part of a scheme to defraud plaintiff (and other suppliers) of certain dried fruits and nuts. Specifically, defendant Huseyin Cavusoglu ("Cavusoglu") fraudulently induced plaintiff to supply approximately $1.1 million in apricots and pine nuts and, defaulted in payment thereof. Cavusoglu misappropriated the proceeds of the sales of plaintiff's goods, including paying the mortgage on his personal residence and satisfying other personal debts. When plaintiff sued the shell company in 2010, defendant, who owned and controlled the shell company, simply confessed a judgment in the name of the shell company, promptly dissolved the shell company and sought to avoid responsibility for the massive debt he incurred.

1

**JURISDICTION**

2. Jurisdiction is proper in this Court under 28 U.S.C. § 1332(a)(2), because the matter in controversy exceeds the sum of $75,000 exclusive of interest and costs and is between citizens of a State and citizens of a foreign state.

**VENUE**

3. Venue is proper in this district under 28 U.S.C. § 1391(a)(1) because the substantial part of the events or omissions giving rise to the claims herein occurred in this district, and/or a substantial part of property that is the subject of the action is also situated in this district.

**PARTIES**

4. Plaintiff Cevdet Aksüt ve Oğullari Koll. Sti. ("Aksut & Sons") is a Turkish corporation with its principal place of business at Devlet Karayolu Uzeri Dallica Koyu 09800 Nazilli, Turkey. Aksut & Sons is a seller and exporter of food products, including apricots and pine nuts.

5. Defendant Huseyin Cavusoglu ("Cavusoglu") is, on information and belief, an individual residing at 95 Ridge Road, Windham, New Hampshire. Further on information and belief, Mr. Cavusoglu is the former principal and President of HGC (described below) and at all relevant times had complete control over HGC's operations. At all times relevant hereto Cavusoglu personally transacted and conducted business at 1200 West Blancke Street, Linden, New Jersey 07036 and, upon information and belief, continues to do so.

6. HGC Commodities Corporation ("HGC") is, on information and belief, a New Jersey corporation with its principal place of business at 1200 West Blancke Street, Linden, New Jersey 07036. Further on information and belief, HGC, at all times relevant hereto, was an importer and distributor of commodities, including food products.

**PRIOR RELATED PROCEEDINGS**

7. On June 1, 2010 plaintiff commenced an action in this Court against both Cavusoglu and HGC for fraud and breach of contract, among other things, related to the goods shipped to HGC at the request of Cavusoglu (the same goods which form the basis of the claims here). That action bears Case No. 2:10-cv-02750 (the "HGC Action") and was assigned to the Hon. William J. Martini.

8. Pursuant to Settlement Agreement dated May 2, 2011, the parties to the HGC Action entered into a Settlement Agreement whereby HGC agreed to pay plaintiff the sum of $625,000 over a period of 14 months. The Settlement Agreement provided for the dismissal of claims against Cavusoglu, subject to those claims being reinstated (with a waiver as to any statute of limitations or jurisdictional defenses) upon default. The Settlement Agreement also provided for entry of judgment against HGC for the full amount stated in the complaint, to wit, $1,095,000, plus interest. HGC defaulted immediately upon execution of the Settlement Agreement, and on July 14, 2011, judgment in the amount of $1,123,500 was entered against HGC (the "HGC Judgment"). A copy of the HGC Judgment is attached hereto as Exhibit A.

**FACTS**

9. In the summer of 2009, Aksut & Sons' Sales Manager, Oguz Kanyilmaz, was contacted by Aret Museoglu, a representative of a customer. Mr. Museoglu recommended that Aksut & Sons do business with his colleague, Huseyin Cavusoglu. Mr. Museoglu told Mr. Kanyilmaz that Mr. Cavusoglu was a "big player" in the Turkish-food-import business, that all the large companies did business with him, that he had been in business for many years, and that he was trustworthy.

10. In or about September 2009, Mr. Cavusoglu called Mr. Kaniyilmaz and represented himself to be the owner of HGC. He informed Mr. Kanyilmaz that he wished to place an order for a large quantity of Turkish dried apricots and pine nuts for shipment to the United States. Mr. Kanyilmaz advised Mr. Cavusoglu that Aksut & Sons normally required foreign sellers to post a letter of credit from a recognized bank.

11. Mr. Cavusoglu represented that HGC had been in business for over 20 years and that he was personally trustworthy. He said that it is not the practice in the U.S. food-import business to obtain letters of credit and that he personally intended to ensure that Aksut & Sons was promptly paid. He represented that relationships in the industry were based on trust and Aksut & Sons should trust him.

12. These representations were false and Cavusoglu knew them to be false. His company has only been in business for four years. Letters of credit are common financing devices in the US food-import business. And, as fully set forth below, Mr. Cavusoglu was not in the least trustworthy.

13. Mr. Cavusoglu objected to the expense of a letter of credit and asked Mr. Kanyilmaz to waive this requirement. Mr. Kanyilmaz initially refused. In a series of telephone calls in September and October of 2009, Cavusoglu attempted to convince Mr.

4

Kanyilmaz of his creditworthiness and personal integrity. Mr. Cavusoglu represented that it was his intention to pay immediately, that he had clients who trusted him enough to send him a bill of lading before shipment, and that Mr. Kanyilmaz should rely on his word and trust his good intentions. He stated that he had never breached a customer's trust.

        14. These representations were false and Cavusoglu knew them to be false. In keeping with his past practices, Cavusoglu had no intention of paying promptly. Indeed, he had no intention of paying at all. The only clients who had trusted him enough to send bills of lading prior to shipment had met the same fate as Aksut & Sons – an unsatisfied invoice and goods converted without payment. Indeed at that time Cavusoglu had a history and practice of forming undercapitalized corporations, obtaining large quantities of merchandise on credit from suppliers (like plaintiff) in the name of the undercapitalized company, selling the merchandise and keeping 100% of the proceeds and then defaulting on payment to suppliers. Cavusoglu would simply then just walk away from the shell companies leaving the suppliers – often times Turkish companies with little or no access to the American court system – with no prospect of

        15. At all relevant times, Mr. Cavusoglu knew that any waiver of Aksut & Sons' letter of credit requirement would be in reliance on his personal representations and therefore he owed a duty to Aksut & Sons to represent the facts and his intentions accurately and truthfully.

        16. In October 2009 Mr. Cavusoglu ordered from Aksut & Sons a quantity of Turkish dried apricots and pine nuts with an approximate value of $1,125,000.00. Mr. Kanyilmaz dealt directly with Mr. Cavusoglu on this transaction.

17. In reliance on Mr. Cavusoglu's representations set forth above, and his promises that he would personally see to prompt payment, Mr. Kanyilmaz agreed to waive the letter of credit requirement and instead agreed to a 45-day payment term.

18. The parties agreed that the apricots and pine nuts would be shipped in several shipments, each of which would be paid for via a documentary draft through PNC Bank. The terms of payment were that HGC would pay each draft within 45 days of the date of its corresponding bill of lading. PNC was not to release documents of title until HGC delivered its undertaking to pay for the shipment within 45 days of the bill of lading date. On or about October 20, 2009, Mr. Cavusoglu assured Mr. Kanyilmaz by telephone that payment would be made. Mr. Kanyilmaz relied on Mr. Cavusoglu's assurance.

19. On thirteen separate occasions between October 26, 2009 and December 10, 2009, Aksut & Sons shipped cargoes of apricots and pine nuts to HGC. With respect to each of the thirteen cargoes, Aksut & Sons' bank delivered documents of title to PNC Bank with instructions only to release the documents in exchange for HGC's undertaking to pay within 45 days.

20. With respect to each of the thirteen shipments, Aksut & Sons delivered an invoice to HGC. HGC accepted all of these invoices without objection.

21. With respect to each cargo, HGC, by Mr. Cavusoglu, delivered its written undertaking to pay Aksut & Sons' draft within 45 days of the bill of lading date.

22. Each shipment was received and accepted by HGC without objection.

23. On information and belief, HGC has sold or exchanged for value substantially all of the products shipped by Aksut & Sons.

24. HGC has failed to pay Aksut & Sons' drafts and has otherwise failed to pay for the goods sold, delivered, and accepted without objection.

25. In December 2009, after most of the goods had been delivered, Mr. Museoglu, who had initially recommended Mr. Cavusoglu, again called Mr. Kanyilmaz. Recanting his prior glowing review of Mr. Cavusoglu, Mr. Museoglu admitted that, back in the summer when he had initially recommended Mr. Cavusoglu, he knew Mr. Cavusoglu to be dishonest, that Mr. Cavusoglu's practice was to promise prompt payment and then renege on the promise, and that Mr. Cavusoglu took unfair advantage of his suppliers whenever the opportunity presented itself. Mr. Museoglu informed Mr. Kanyilmaz that Mr. Cavusoglu was a defendant in several lawsuits for failure to pay for goods sold and delivered and that Aksut & Sons should take care in dealing with Cavusoglu.

26. On information and belief, Cavusoglu and Museoglu conspired together in the summer of 2009 to defraud Aksut & Sons and acted on that conspiracy by making false representations about Cavusoglu's personal integrity, intentions, and past acts.

27. In December 2009, after receiving the second call from Museoglu, Mr. Kanyilmaz had a series of telephone conversations and e-mail correspondence with Cavusoglu. In each conversation and e-mail, Cavusoglu reaffirmed his personal integrity and intention to pay for the goods, yet each time offered a different excuse for why payment had not yet been made.

28. HGC and Cavusoglu failed to make a single payment against the outstanding amount of $1,125,000 and on June 1, 2010, plaintiff commenced an action against both HGC and Cavusoglu in this Court (Docket No. 2:10-cv-02750-WJM -MF).

29. On July 14, 2011, this Court entered a judgment against HGC in the amount of $1,123,500.

### FACTS RELATED TO CAVUSOGLU'S HISTORY OF FRAUDULENT AND DECEPTIVE BUSINESS PRACTICES

30. Prior to the formation of HGC in 2006, Cavusoglu operated the very same business out of the very same location as that of HGC.  Specifically, Cavusoglu operated CNC Warehousing Corporation ("CNC") and Northeast Imports Inc. ("NEI") at 1200 West Blancke Street, Linden, New Jersey 07036.  Like HGC, Cavusoglu used those entities as importers and distributors of commodities, including food products.

31. As with HGC Cavusolgu ran up massive debts to suppliers utilizing the corporate vehicles of CNC and NEI.

32. Cavusoglu shut down CNC in or about 2005 and formed HGC to carry on what was essentially the same business in 2006.  Cavusolgu has testified that he shut down CNC in 2005 to "get rid of the debts" and thereafterformed HGC to do exactly what CNC had been doing, less the debt load. Cavusoglu admitted that CNC and NEI were at one time defendants in lawsuits wherein the claims were in excess of $2 million – for which Cavusolgu settled at $1.2 million backed by his personal guarantee.

33. During its time of operating CNC had but one customer, to wit, Sunrise Corporation located in

34. According to Cavusoglu, for years Cavusolgu agreed to business terms with Sunrise such that the amounts paid by Sunrise for warehousing services were

not enough to cover CNC's (and NEI's) basic operating expenses, and CNC was necessarily and always insolvent. Cavusoglu claims to have agreed to business terms with Sunrise such that he knew on any given transaction he was taking a loss of 30% - 40%. In other words, Cavusoglu knew at all times relevant hereto that at the time he placed the orders with plaintiff (or any other supplier) the payment he would subsequently receive from his sole customer Sunrise would be 30% - 40% less than the cost of goods purchased.

35. At the time HGC was formed in 2006 Cavusolgu had substantial knowledge of and experience in the importing distribution and warehousing business such that he knew or should have know what the basic operating costs and capital requirements were.

36. Cavusolgu has admitted under oath that he invested no capital into HGC, only his "knowledge."

37. Cavusolgu has admitted that at the time he ordered approximately $1.2 million worth of dried apricots and pine nuts from plaintiff HGC had no cash with which to pay for same. Indeed Cavusoglu has admitted that HGC only had approximately $10,000 in the bank at the time.

38. Cavusoglu has further admitted that HGC operated at a loss in 2007, 2008, 2009, 2010 and 2011, when it was finally dissolved.

39. Insofar as Sunrise Corp. was the only customer HGC had when it ordered goods form plaintiff, based on the long standing course of dealing and prices established between Sunrise and HGC, and the perennial losses sustained by HGC, Cavusoglu knew at the time he ordered the products from plaintiff that he would never

9

have or generate enough money to cover their cost. As stated above, in fact, Cavusoglu paid nothing against a $1.2 million order.

40. In addition to the amounts owing by HGC to plaintiff, Cavusolgu has admitted that HGC is also indebted several other suppliers totaling, in the aggregate, in the approximate amount of $750,000. Specifically, Cavusoglu has admitted to HGC's indebtedness to the following suppliers:

    (i)    Celil Ticaret, in the amount of $200,000;

    (ii)    Erenler in the amount of $500,000;

    (iii)    Sekerciler in the amount of $50,000.

41. Cavusoglu has claimed that HGC grossed the following amounts in the years indicated:

```
2007:  $4,000,000
2008:  $5,000,000
2009:  $3,000,000.
```

42. Notwithstanding revenues in the multiple millions and failing to pay for the goods used to generate the revenue, Cavusoglu claims that he only earned $40,000 per year as the sole owner and officer of HGC.

43. According to Cavusolgu HGC's debts to suppliers are in excess of $2 million.

44. Cavusoglu has admitted that on numerous occasions he used HGC's corporate funds and checking account to pay the mortgage on his personal residence.

45. Cavusoglu has admitted that Sunrise paid HGC approximately $700,000 toward the purchase of the goods supplied to it by plaintiff.

46. Cavusoglu has further admitted that he used the proceeds from the sale of plaintiff's goods to pay off a bank loan in Turkey, which loan was secured by real property that Cavusolgu owned in Turkey.

47. Cavusoglu has admitted that HGC neither kept nor maintained any corporate minutes memorializing the meetings of shareholders or directors and in fact there were never any such meetings.

48. Cavusoglu admitted under oath that he failed to pay withholding taxes from 1996 - 2011 for up to nine employees of HGC (and CNC before).  Specifically Cavusoglu admitted that he paid the aforesaid employees on average $600 a week ($31,200 per year) in cash.

### FIRST COUNT  (Breach of Fiduciary Duty)

49.  Plaintiff repeats paragraphs 1 through 48.

50.  At all time material hereto HGC was insolvent.

51.  At the time HGC, through Cavusoglu, placed the subject orders with plaintiff, Cavusolgu owed plaintiff a fiduciary duty which required him to preserve all funds for the benefit of HGC's creditors, including plaintiff.

52. Cavusoglu was under a fiduciary duty to hold in trust for plaintiff the proceeds from the sale of plaintiff's goods.

53.  Cavusoglu breached his fiduciary duty by misappropriating funds generated from the sale of plaintiff's goods.

54. Cavusoglu is liable to plaintiff for breach of fiduciary duty in the

amount to be proven at trial and believed to be in excess of $1,128,500.80.

WHEREFORE, Plaintiff demands judgment against Cavusolgu in an amount to be determined at trial, plus interest, costs, and such other and further relief as the Court shall deem just and proper.

### SECOND COUNT (Fraud)

55. Plaintiff repeats paragraphs 1 through 54.

56. To induce plaintiff to enter into a contract, Cavusoglu falsely stated his intention to pay for the goods, when in fact he had no such intention.

57. To induce plaintiff to enter into a contract, Cavusoglu falsely represented that HGC had been in business for over 20 years and conducted business with many large companies.

58. To induce plaintiff to enter into a contract, Cavusoglu falsely represented that HGC had never breached a customer's trust.

59. To induce plaintiff to continue shipping goods, Cavusoglu submitted false written undertakings to pay for the goods, when in fact they had no intention of doing so.

60. Cavusoglu intended for plaintiff to rely on their his representations by (a) entering into a contract with HGC, and (b) continuing to ship goods before being paid for them.

61. Plaintiff reasonably relied on defendants' false representations to its detriment.

62. Cavusoglu knew, or had reason to know, that at the time that HGC placed the orders for plaintiff's goods HGC no financial wherewithal to pay for same and that, in fact, HGC would default in the payment thereof.

63. At the time Cavusoglu promised to pay for the goods he ordered from plaintiff he had no intention to pay for same.

64. Plaintiff has been damaged by Cavusoglu's fraud in the amount of $1,128,500.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount to be determined at trial, plus interest, costs, and such other and further relief as the Court shall deem just and proper.

### THIRD COUNT (Negligent Misrepresentation)

65. Plaintiff repeats paragraphs 1 through 64.

66. In the alternative, in the event that the trier of fact determines that the misrepresentations and material omissions referred to above were not intentional, then in making such misrepresentations and omissions, Cavusoglu acted negligently in violation of the standard of care required of him.

67. Cavusoglu had a duty to deal with plaintiff in good faith and had a duty to exercise care in their representations because they knew plaintiff would rely on those representations in agreeing to ship valuable goods to HGC.

68. Cavusoglu breached that duty of care by negligently or recklessly uttering false statements about HGC's history, intentions, trustworthiness, ability to pay, and past practices, as fully described above.

69. As a proximate result of Cavusoglu's negligence, Plaintiff entered into a contract with HGC and shipped goods to HGC.

70. As a proximate result of the aforesaid actions, misrepresentations, and omissions, Plaintiff suffered damages in the amount of not less than $1,128,093.80.

71. Cavusoglu is liable to plaintiff for negligent misrepresentation in the amount of $1,128,500.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount to be determined at trial, plus interest, costs, and such other and further relief as the Court shall deem just and proper.

### FOURTH COUNT (Unjust Enrichment)

72. Plaintiff repeats paragraphs 1 through 71.

73. Cavusoglu received shipments from plaintiff under circumstances rendering it unfair for Cavusoglu retain the benefit thereof.

74. In receiving plaintiff's apricots without paying for them, Cavusoglu was unjustly enriched.

75. Cavusoglu is liable to plaintiff for unjust enrichment in the amount of $1,128,500.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount to be determined at trial, plus interest, costs, and such other and further relief as the Court shall deem just and proper.

### FIFTH COUNT (Veil Piercing)

76. Plaintiff repeats paragraphs 1 through 73.

77. Cavusoglu dominated and controlled HGC.

78. From and throughout its formation of HGC Cavusolgu failed to

maintain or keep corporate minutes and records, failed to hold any meetings of shareholders and directors and to otherwise preserve the integrity of HGC as a legitimate independent legal entity.

79. Cavusolgu used HGC's corporate funds to pay his personal expenses, including the mortgage on his residence in New Hampshire.

80. The formation of HGC by Cavusoglu was part of an unlawful scheme to defraud creditors.

81. HGC was an instrumentality through which Cavusoglu perpetrated a fraud and realized unlawful gains and did otherwise personally benefit therefrom.

82. HGC was the alter ego of Cavusoglu.

83. At all times relevant hereto HGC was under-capitalized.

84. At all times relevant hereto Cavusolgu knew that the operation of HGC, and importing and distributing dried fruits and nuts generally, required substantial capital.

85. By virtue of the foregoing HGC's corporate veil should be pierced, and its status as an independent legal disregarded.

86. Cavusoglu is liable to for the debts of HGC, including the amount of $1,128,500 owing to plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount to be determined at trial, plus interest, costs, and such other and further relief as the Court shall deem just and proper.

### SIXTH COUNT (Conversion)

87. Plaintiff repeat paragraphs 1 through 86.

88. Cavusoglu has gained possession of property of plaintiff.

89. Cavusoglu exercised unlawful dominion and control over property of plaintiff.

90. Cavusoglu has converted property of plaintiff.

91. Plaintiff has been damaged by Cavusoglu's conversion of its property.

92. Cavusoglu is liable to Seller for conversion in the amount of $1,829,891.00.

WHEREFORE, Plaintiff demands judgment against Buyer in an amount to be determined at trial, plus interest, costs, and such other and further relief as the Court shall deem just and proper.


Dated: New York, New York
     May 14, 2012

RUTA SOULIOS & STRATIS LLP
Attorneys for CEVDET AKSÜT VE OĞULLARI KOLL. STI,


By: s/ Steven A. Soulios
    Steven A. Soulios (SAS-4832)
A Member of the Firm
101 Town Center Drive, Suite 111
Warren, New Jersey 07059
(908) 769-4250