NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CEVDET AKSÜT VE OĞULLARI KOLL. STI,<br><br>    **Plaintiff,**<br><br>v.<br><br>HUSEYIN T. CAVUSOGLU,<br><br>    **Defendant.** | Civ. No. 12-2899 (WJM)<br><br><br>**OPINION** |

**WILLIAM J. MARTINI, U.S.D.J.**

This matter comes before the Court on Plaintiff's Motion for Summary Judgment and Defendant's Cross-Motion for Summary Judgment.[1] Plaintiff Cevdet Aksüt Ve Oğullari Koll. Sti ("Cevdet Aksüt") is a Turkish corporation which shipped over $1 million worth of food products to non-party HGC Commodities, Inc. ("HGC"), a dissolved corporation that was wholly-owned and controlled by its President, Defendant Huseyin Cavusoglu. (*See* Plaintiff's Exhibit C at 9). For the reasons set forth below, Plaintiff's Motion is denied, and Defendant's Cross-Motion is granted in part and denied in part.

## I.   BACKGROUND

Cevdet Aksüt is a seller and exporter of food products, including dried apricots and pine nuts. (Plaintiff's Undisputed Statement of Facts/Defendant's Response ("SOF") ¶ 7).[2] HGC Commodities Corporation ("HGC") is a dissolved New Jersey corporation that was wholly-owned by Cavusoglu. (*See* Plaintiff's

---

[1] Defendant's Cross-Motion included a request to consolidate this case with Civ. No. 14-3362. Plaintiff objected to the insertion of this Motion to Consolidate into the Cross-Motion as untimely. (ECF No. 65). Although Defendant's Motion to Consolidate was filed out of time, the Motion to Consolidate appears to have some merit. In the interests of judicial economy, the Court decided to hear arguments on consolidation, giving Plaintiff until June 29, 2015 to oppose. (ECF Nos. 67, 69). The Motion to Consolidate will be addressed under separate opinion and order.

[2] Defendant submitted a Response to Plaintiff's SOF, which tracks the Plaintiff's SOF paragraph by paragraph. (ECF No. 64-2). Wherever this Opinion cites to the Plaintiff's SOF, the citation refers jointly to the corresponding paragraph in Defendant's Response.

Exhibit F).  Cavusoglu is the former President of HGC and had control over HGC's operations.  (*See* Plaintiff's Exhibit C at 8).  HGC was an importer, packager, warehouser, and distributor of food products.  (*See* Plaintiff's Exhibit C at 11).

At some point before October 26, 2009, HGC placed two orders with Cevdet Aksüt.  (*See* Plaintiff's Exhibit J at 106-109).  HGC paid Cevdet Aksüt about $114,000 on a cash against documents basis for these shipments.[3]  (Plaintiff's Exhibit J at 107-108; Certification of Huseyin Cavusoglu ("Cavusoglu Cert.") at ¶ 12).

After those first two shipments, Cavusoglu desired another.  (Cavusoglu Cert. at ¶¶ 12-13).  When he contacted Cevdet Aksüt this time, however, he stated that he did not have the funds to do another cash against documents purchase.  (Plaintiff's Exhibit J at 108-109).  He asked Cevdet Aksüt to send a shipment on a verbal guarantee of payment within 45 days.  (*Id.* at 108-112).  Cavusoglu represented to Cevdet Aksüt that HGC had been doing business for 22 years, that he needed to establish a good relationship with a firm that could ship big orders, that his clients were three "big firms," that all his suppliers shipped to him without cash against documents, that he never had problems making payments to suppliers in the past, and that he could guarantee payment within 45 days because that was how long he would need to obtain payment from his "big firms" customers.  (*Id.* at 72, 83, 109, 111).

Although Cevdet Aksüt normally required letters of credit or cash against documents (*Id.* at 52-53), Cevdet Aksüt agreed to ship the products on credit, in part, because of Cavusoglu's representations.  (*Id.* at 110-111).  Between October 26, 2009 and December 10, 2009, Cevdet Aksüt shipped 13 orders of dried apricots and pine nuts to HGC.  (SOF ¶ 7).  The approximate value of these shipments was

---

[3] "Cash against documents" is a type of unsecured transaction that international sellers use to minimize the risk of shipping goods to insolvent buyers in foreign countries.  In a cash against documents transaction,

> the documents (including the bill of lading) are sent from seller to buyer through the international banking system.  The buyer's bank is the "presenting" bank.  It is instructed not to release the documents to the foreign buyer until it has received remittance from the buyer, which it then wires to the seller's American bank.  If the buyer inspects the goods and finds nonconformity, the burden is on it to sue (or initiate arbitration).  If the presenting bank remits before getting reimbursed by the buyer in fully collected funds, the insolvency risk is on its broad shoulders.  If the bank violates the seller's instructions by releasing the documents to the buyer before remittance, it will probably be liable to the seller for damages.  If the buyer's bank presents the documents to the buyer and the buyer is unable to remit because of insolvency, the bank acts as the seller's agent in receiving instructions regarding resale of the goods to a third party.  Once that substitute sale has taken place, the seller could pursue any deficiency claim against the buyer.

Clark & Clark, The Law of Bank Deposits, Collections, and Credit Cards § 13.10.

$1,125,000.  (*Id.*).  Cavusoglu did not pay within 45 days.  (Plaintiff's Exhibit J at 139).  When Cevdet Aksüt attempted to contact Cavusoglu by phone, he would not pick up or respond.  (*Id.*).

On June 1, 2010, Plaintiff commenced an action in the United States District Court for the District of New Jersey against both Cavusoglu and HGC.  (Civ No.10-2750 ("*Cevdet Aksüt I*")).  Pursuant to an agreement dated May 2, 2011 (the "Settlement Agreement"), the parties agreed to settle *Cevdet Aksüt I* for the sum of $625,000.00, to be paid over a period of 14 months.  (Defendant's Exhibit 4).  The Settlement Agreement notes that the Defendants had already paid $30,000 of the total due.  (*Id.*).  The Settlement Agreement provided for the dismissal of claims against Cavusoglu, subject to those claims being reinstated (with a waiver as to any statute of limitations or jurisdictional defenses) upon default.  The Settlement Agreement also provided, via a Confession of Judgment, for entry of judgment against HGC for the full amount of $1,095,000.00 plus interest in the event of HGC's default.  (Defendant's Exhibit 4; *see also* Civ. No. 10-2750 (ECF No. 29-1)).  HGC almost immediately breached the terms of the Settlement Agreement, and on July 14, 2011, the Court entered judgment against HGC, and only HGC, in the total amount of $1,123,500 ($1,095,000.00 plus pre-judgment interest of $28,500).  (Plaintiff's Exhibit A).

Plaintiff commenced collection proceedings (e.g. information subpoenas, depositions) for the *Cevdet Aksüt I* judgment.  During a December 2011 deposition, Plaintiff uncovered information that led to the filing of this case ("*Cevdet Aksüt II*").  Specifically, Cavusoglu admitted that he was the sole director and owner of 100% of HGC's stock, that he kept no minutes or records of meetings, that he invested no capital in HGC, and that he operated the company at a loss from its inception in 2006 until he dissolved it in June 2011.  (SOF at ¶¶ 15-18; Plaintiff's Exhibit R at 244).  He also admitted a checkered financial history that was not consistent with the representations of creditworthiness that he made to Cevdet Aksüt in order to secure the additional 13 shipments.  Based on these revelations, the *Cevdet Aksüt II* Complaint set forth a claim to pierce the corporate veil and hold Cavusoglu personally liable for the *Cevdet Aksüt I* judgment.  The *Cevdet Aksüt II* Complaint also contains counts against Cavusoglu for breach of fraud, fiduciary duty, negligent misrepresentation, unjust enrichment, and conversion.  (SOF ¶ 14; Plaintiff's Exhibit B).

## A.  Cavusoglu's Business History

Cavusoglu explained in his December 2011 deposition that he was introduced into the import business in the 1980s.  Sometime around 1992, the Turkish import company he was working for left the United States.  Cavusoglu then set up corporate entities that owned retail shops in Brooklyn.  (Plaintiff's Exhibit C at 11-14). Cavusoglu imported Turkish products like nuts, dried fruits, olives, olive oil, tea, and soap to sell in his stores.  (Plaintiff's Exhibit C at 12).

In 1992, Cavusoglu, through his retail entities and another Cavusoglu entity called Northeast Imports, began doing business with American Pistachio Company d/b/a Sunrise Commodities Corporation ("Sunrise").  (Plaintiff's Exhibit C at 13-14).  Cavusoglu  stated that he did Sunrise's Turkish imports and their packaging. (*Id.* at 13).

In 1995, Cavusoglu signed a lease for a 60,000 square foot warehouse in Linden, New Jersey. (the "Linden Warehouse")  (*Id.* at 15).  He claimed that the lease was held by another one of his business entities, CNC Warehousing d/b/a Sona Trading ("CNC").  (*Id.* at 15, 17).  The rent on the Linden Warehouse was about $22,000 per month, and with other expenses, it cost about $100,000 a month to run. (*Id.* at 29-30).  Beginning sometime around 2000, Cavusoglu fell about $100,000 behind on the rent and faced eviction. (*Id.* at 25).  According to Cavusoglu, Sunrise did not want him to be evicted, so Sunrise began paying the $22,000 monthly rent obligation directly to the Linden Warehouse's landlord.  Cavusoglu would reduce invoices to Sunrise accordingly.  (*Id.* at 25).  Sunrise continued to pay the rent on the Linden Warehouse until all Cavusoglu entities vacated the Linden Warehouse in 2011.  (*Id.* at 23, 25).

Cavusoglu testified that in 2005, he needed to close CNC because CNC was not "generating enough income to survive."  (*Id.* at 28).  At the time, CNC had approximately $50,000 or $60,000 in outstanding liabilities. (*Id.*).  He testified that he closed CNC's bank account in 2005. (Defendant's Exhibit 2 at 18).  In his 2011 deposition, Cavusoglu stated that Sunrise's "main principal," Mordy Dicker, told Cavusoglu, "[L]ook, we will – you know, you will close the company and you will form another company, get rid of your debts or whatever, so you start fresh and we will keep you supported."  (Plaintiff's Exhibit C at 28).  Cavusoglu did so in 2006, forming HGC.  (*Id.* at 17).  According to the December 2011 deposition, he placed no capital into HGC.  (*Id.* at 32).  Sunrise was HGC's only customer.  (*Id.* at 27).

Cavusoglu complained in his 2011 deposition that Sunrise always underpaid him. (*Id.* at 34). He also claimed in this deposition that Sunrise owed HGC about $500,000. (*Id.* at 33). He claimed that Sunrise only paid him $600,000 to $700,000 for the $1.1 million worth of merchandise they purchased from him via the Cevdet Aksüt shipments. (*Id.* at 69).

## B. Flow of Assets Through Cavusoglu and his Entities After Shipment from Cevdet Aksüt

Cavusoglu admitted that with the proceeds from the sale of Cevdet Aksüt's 13 shipments, he paid off the debts of a Turkish corporation that he and his wife wholly owned and controlled called Celil Ticaret ("Celil"). (Plaintiff's Exhibit C at 70-72). Cavusoglu testified in a 2014 deposition that, around 2003 or 2004, he created Celil as a Turkish apricot exporter in order to control the quality of apricot shipments from Turkey. (Defendant's Exhibit 2 at 129-134). He found a manager in Turkey named Sadet Kandil to run the business of purchasing quality apricots and then shipping them to Cavusoglu entities in the United States. (*Id.*). During the 2011 deposition, Cavusoglu admitted that Celil had borrowed $1.2 million from a Turkish bank, secured by apartments he owned in Turkey. (Plaintiff's Exhibit C at 70-71). The loan was used to finance the cost of shipping apricots to the United States. (Plaintiff's Exhibit C at 70-71). Cavusoglu testified that the proceeds from the sale of Cevdet Aksüt's goods went to pay off Celil's secured debts. (*Id.* at 70-72).

Plaintiff has produced HGC's bank records for most of 2010. During that time, there were many deposits made into HGC's bank accounts. Hundreds of thousands of dollars came from Sunrise, but many came from other individuals and entities. (Plaintiff's Exhibit Q). HGC paid hundreds of thousands of dollars to Turkish banks and other Turkish entities, to Celil, to his wife and children, to Chase Bank, to himself, to student loan creditors, and even to Northeast Imports, a Cavusoglu entity that he dissolved in 2003.[4] (*See* Plaintiff's Exhibit Q; Plaintiff's

---

[4] The Court has reviewed the bank records in Plaintiff's Exhibit Q and finds the following individuals, whose rights to HGC's assets are disputed, received the following aggregate amounts:

| | |
|---|---|
| Robin Cavusoglu: | $16,684.16 |
| Huseyin Cavusoglu: | $59,378.04 |
| Hamdi Cavusoglu: | $9,251.30 |
| Munevver Cavusoglu: | $34,253.39 |
| Guslan Cavusoglu: | $2,169.64 |
| Celil Cavusoglu: | $1,500.00 |
| Muammer Bivik: | $60,386.00 |
| Sadet Kandil: | $22,500.00 |

Exhibit C at 15).  Cavusoglu also made cash withdrawals from HGC during 2010, the total amount of which are disputed, but which may have been as high as $447,000.  (SOF ¶ 10).  Cavusoglu claims that this money paid employees or creditors who would not accept his checks because the checks were bouncing. (Plaintiff's Exhibit C at 100; Defendant's Exhibit 2 at 186; Defendant's Exhibit 3 at 308).

### C. The Dissolution of HGC

Cavusoglu testified that in May 2010, Sunrise pulled all its inventory out of the Linden Warehouse.  (Plaintiff's Exhibit C at 83).  Then, the IRS called him to their office because of unpaid tax obligations going back to 2009.  (*Id.* at 21).  HGC did not pay the tax obligation because it had no more income.  (*Id.* at 21).  The IRS placed a levy on HGC.  (*Id.* at 21).  The IRS closed the file, but not without advising Cavusoglu that he had to dissolve HGC.  (*Id.* at 21-22).  Cavusoglu testified that he filed HGC's dissolution paperwork in March 2011 and that HGC was dissolved by June 2011.  (Plaintiff's Exhibit F; Plaintiff's Exhibit C at 83; Plaintiff's Exhibit R at 244).  Incidentally, June 2011 was the same month Cavusoglu signed the Settlement Agreement holding HGC and only HGC liable for damages in *Cevdet Aksüt I.*

### D.    Cavusoglu's Re-Entry Into the Food Import Business

In 2014, Northeast Imports, an entity that Cavusoglu claimed he dissolved in 2003 became the "consignee" for the shipment of many tons of dried apricots sent from Turkey and delivered to the Linden Warehouse.  (Plaintiff's Exhibit Z). Cavusoglu testified that he simply allowed another company, Natural Food Source of Pennsylvania, to use the name of his dissolved company, free of charge, for the purpose of obtaining exports.  (Defendant's Exhibit 3 at 370-372).

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides for summary judgment "if the pleadings, the discovery [including, depositions, answers to interrogatories, and

---

| | |
|---|---|
| Galip Unsalan: | $2,506.25 |
| Northeast Imports: | $24,788.35 |
| Celil Ticaret Ithracat: | $141,200.00 |
| Chase Credit Card: | $8,822.00 |
| Case Home Equity: | $4,026.71 |
| Chase Student Loan: | $16,000.00 |
| **Total:** | **$403,465.584** |

admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court considers all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

## III.   DISCUSSION

### A. Piercing the Corporate Veil

Piercing the corporate veil is not an independent cause of action, but rather, an equitable remedy through which the court may impose liability on shareholders who abuse the corporate form and use their corporation as an alter ego in order to advance personal interests. *Sean Wood, L.L.C. v. Hegarty Group., Inc.*, 422 N.J. Super. 500, 517 (App. Div. 2011); *Tulli-Makowski v. Cmty. Educ. Centers, Inc.*, 2013 WL 6623885, at *8 (D.N.J. Dec. 16, 2013). Before invoking an alter ego theory to pierce the corporate veil, evidence must first establish an independent basis to hold the corporation liable. *Sean Wood v. Hegarty Group*, 422 N.J. Super. at 518. In this case, it is undisputed that there is a valid judgment to be collected against HGC, and here, the Court only need decide if the corporate veil may be pierced to hold Cavusoglu personally liable for that judgment.

The analysis of Plaintiff's request to pierce the corporate veil begins with "the fundamental proposition that a corporation is a separate entity from its shareholders, and that a primary reason for incorporation is the insulation of shareholders from the liabilities of the corporate enterprise." *State Capital Title & Abstract Co. v. Pappas Bus. Servs., LLC*, 646 F. Supp. 2d 668, 678-79 (D.N.J. 2009) (*quoting Lyon v. Barrett*, 89 N.J. 294, 300 (1982) and *State Dept. Of Environmental Protection v. Ventron Corp.*, 94 N.J. 473, 500 (1983)). Disregarding the corporate form is therefore an extraordinary remedy used only when a plaintiff proves that a defendant shareholder abused the corporate form to perpetrate a fraud or injustice. *Id.* (*citing Ventron*, 94 N.J. at 500; *Lyon*, 89 N.J. at 300; *Tung v. Briant Park Homes, Inc.*, 287 N.J. Super. 232, 240 (App. Div. 1996)). In this case, whether Plaintiff has so proven is a disputed issue of material fact.

In order to pierce the corporate veil, a plaintiff must prove two elements by clear and convincing evidence. *The Mall at IV Group Properties, LLC v. Roberts*, 2005 WL 3338369, at *3 (D.N.J. Dec. 8, 2005); *Trustees of Nat. Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 192 (3d Cir. 2003). "First, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist.  Second, the circumstances must indicate that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice."  *The Mall*, 2005 WL 3338369, at *3 (*citing* 1 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 41.30 (perm. ed., rev. vol. 1999)).

In determining whether a unity of interest and ownership exists under the first prong, the Third Circuit has applied several non-binding factors to guide this inquiry: (1) gross undercapitalization, (2) failure to observe corporate formalities, (3) non-payment of dividends, (4) the insolvency of the debtor corporation at the time, (5) siphoning of funds of the corporation by the dominant stockholder, (6) non-functioning of other officers or directors, (7) absence of corporate records, and (7) the fact that the corporation is merely a façade for the operations of the dominant stockholder or stockholders."  *Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 150 (3d Cir. 1988) (citations omitted).

"The considerations applicable to piercing the corporate veil for [the] purpose [of collecting a judgment against a corporate entity] are different, inasmuch as the issue at that juncture is whether there was an abuse of the corporate form to shield funds rather than to perpetrate wrongful conduct."  *Rowan v. Hartford Plaza Ltd.*, 2013 WL 1350095, at *9 (N.J. Super. Ct. App. Div. Apr. 5, 2013).  "In an appropriate case, the doctrine may be applied to hold an individual liable for an otherwise-uncollectible judgment against a corporation."  *Id.*

The record, construed in the best light for Plaintiff, contains clear and convincing evidence of both a unity of interest and ownership, and an abuse of the corporate form to shield funds.  For example, Cavusoglu was the sole owner of HGC's stock.  HGC had no business minutes or records of its meetings.  Cavusoglu admitted at one point that he placed no capital into HGC.  Bank records demonstrate that on September 30, 2009, the month before Cevdet Aksüt sent its first shipment, HGC had a bank account balance of $-69.10.  (Plaintiff's Exhibit Q at HC20).  Cavusoglu stated that HGC was operating at a loss for almost all of its existence.  During the period between Cevdet Aksüt's shipment and the dissolution of HGC, Cavusoglu transferred large sums of money from HGC to other corporate entities he wholly owned and controlled, some of them dissolved corporations.  (*See e.g.*,

Plaintiff's Exhibit Q at 124-125). Bank transfers show HGC transferring $22,500.00 to Sadet Kandil, Cavusoglu's Turkish manager of Celil. He also transferred money to Muamer Biyik, a man whom Cavusoglu identified as running one of his stores. HGC did not own any of those stores, but another entity that Cavusoglu wholly owned and controlled did own those stores. (See Defendant's Exhibit 2 at 121). Cavusoglu also transferred thousands of HGC's dollars to his wife and children and even to himself during a period when banks were "pressuring" him about amounts due on the $1.2 million collateralized loan to Celil. (Plaintiff's Exhibit C at 71). He admitted that he used some of HGC's assets to "stay afloat" as his business crumbled in 2010. (Defendant's Exhibit 3 at 330).

Perhaps most damningly, the timing of the dissolution of HGC bespeaks likely abuse of the corporate form. Both the Settlement Agreement in *Cevdet Aksüt I* and the dissolution of HGC occurred in the same month. Meanwhile, it is clear from the record that Cavusoglu treated HGC and his other dissolved entities as defunct when it came to paying creditors, but when it came to shifting assets around, his dissolved entities had a tendency to suddenly spring to life. Cavusoglu apparently disregarded the life and death of his corporations, the financial separation between HGC and his various entities, and the separation between HGC's assets and his personal expenses. His behavior indicates that he treated the corporations as his "playthings" to avoid his responsibilities to Cevdet Aksüt. *See Sea-Land Servs., Inc. v. Pepper Source*, 993 F.2d 1309, 1312 (7th Cir. 1993). On these facts, a jury might conclude that Cavusoglu knowingly structured both the *Cevdet Aksüt I* Settlement Agreement and the dissolution of HGC to hinder Cevdet Aksüt's ability to collect.

On the other hand, if a jury considered Cavusoglu's testimony in the best possible light for Cavusoglu, it could conclude that Cavusoglu did not abuse the corporate form in order to perpetrate fraud or injustice. Cavusoglu has sworn that he had every intention of paying Cevdet Aksüt back but that shortly after Cevdet Aksüt's shipments arrived, Sunrise began cutting its ties with HGC, which completely ruined him financially. (Defendant's Exhibit 3 at 249-250, 320-321; Cavusoglu Cert. at ¶¶ 14-15). Almost all HGC's assets, he claims, went to pay other creditors. He admits to using some of HGC's assets for personal expenses as his personal financial state deteriorated alongside his business. However, he claims these transfers were justifiable because he had placed $450,000 of his own money into HGC by mortgaging his home in New Hampshire. (Defendant's Exhibit 2 at 51). Finally, he stated that he offered to transfer his family's Turkish properties to Cevdet Aksüt in order to satisfy the debt. (Cavusoglu Cert. at ¶ 16).

Since Plaintiff has not brought forth undisputed material facts warranting the piercing of the corporate veil, judgment cannot be entered on Plaintiff's behalf. Both Plaintiff's and Defendant's motions are denied on this issue.

## B. Fraud

To establish common-law fraud, a plaintiff must prove: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention to induce reliance; (4) reasonable reliance; and (5) resulting damages. *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 172-73 (2005). Plaintiff has brought forth enough evidence from which a rational jury could conclude that Plaintiff has proven all of these elements.

Plaintiff presents evidence that Cavusoglu made several material misrepresentations to Cevdet Aksüt. He told Cevdet Aksüt that HGC had been in business for 22 years when it had only been in business for 4 years. He said that he did business with three "big firms" when HGC actually only had one customer, Sunrise. He also guaranteed Cevdet Aksüt that he could pay within 45 days when he knew that this was unlikely given Sunrise's history of not properly paying him. Finally, he told Cevdet Aksüt that he had never had a problem paying suppliers in the past while creditors refused to accept his checks because they were bouncing (Defendant's Exhibit 2 at 186; Defendant's Exhibit 3 at 308) and Great Lakes International Trading, Inc. had a July 2009 judgment for $10,911.79 against him and CNC jointly.[5] (Plaintiff's Exhibit N). A rational jury could infer from this evidence that Cavusoglu made these misrepresentations with the knowledge that they were false and with the intent to induce Cevdet Aksüt to send its goods on credit.

Defendant's strongest argument is that Cevdet Aksüt's reliance was not reasonable. Defendant argues that Cevdet Aksüt knowingly entered into an unsecured transaction without undertaking any due diligence on the Plaintiff's creditworthiness. Defendant argues that Plaintiff could have done internet research on HGC in order to find out its creditworthiness. The Appellate Division of the Superior Court of New Jersey has stated that when a plaintiff is afforded ample opportunity to uncover the truth of a representation and fails to do so, the defendant cannot be liable for fraud. *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 189 N.J. Super. 347, 356 (App. Div. 1983) *rev'd in part on other grounds*, 97 N.J. 37 (1984).

"Ordinarily, an issue as to the reasonableness or unreasonableness of anything is regarded as a mixed question of law and fact for the determination of the jury." Federal Trial Handbook Civil § 18:9 (4th ed.). Here, Plaintiff has produced evidence

---

[5] The judgment was not satisfied until May 31, 2013. (Plaintiff's Exhibit N).

from which a rational jury could conclude that Plaintiff's reliance on Cavusoglu's representations was reasonable.

Defendant's characterization of Cevdet Aksüt as having undertaken no due diligence before sending $1.1 million worth of goods is not accurate. First, Cevdet Aksüt had already completed two successful transactions of over $100,000 with Cavusoglu before it sent the thirteen shipments worth $1.1 million. Second, Cevdet Aksüt's representative, Oguz Kanyilmaz, explained that he went through a screening process before doing business with HGC. (Plaintiff's Exhibit J at 46-49). The screening process included getting recommendations from existing clients. In this case, Aret Museoglu, who was one of Cavusoglu's competitors, recommended Cavusoglu to Cevdet Aksüt. Mr. Kanyilmaz also spoke with Cavusoglu by phone to assess his understanding of the dried apricot market as part of the screening process. Moreover, Mr. Kanyilmaz testified that it was not uncommon for big companies to demand large orders delivered on pure credit. (Plaintiff's Exhibit J at 110). Cavusoglu represented HGC as a simple middle-man for those big companies. Mr. Kanyilmaz said that he also searched HGC and Cavusoglu on the internet, spoke with the shipping company that did business with Cavusoglu, and spoke to a bank about Cavusoglu. (Plaintiff's Exhibit J at 83-85).

Finally, the evidence could persuade a reasonable jury that Cavusoglu never had any intention of paying for the shipment of goods. The evidence easily could lead a rational jury to conclude that Cavusoglu ordered $1.1 million worth of goods from Cevdet Aksüt with the intent of using the proceeds of sale to avoid foreclosure on the Turkish properties securing the $1.2 million loan to Celil rather than paying Cevdet Aksüt back 45 days later. Under these circumstances, it would be unfair to conclude that Cevdet Aksüt's reliance was unreasonable as a matter of law. Since there are disputed issues of material fact relating to the reasonableness of Plaintiff's reliance, among other elements of fraud, both Plaintiff's Motion and Defendants' Cross-Motion for summary judgment are denied as to the fraud cause of action.

### C. Breach of Fiduciary Duty

Officers and directors of an insolvent company have a fiduciary or "quasi-trust" duty owed to that company's creditors. *Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 173 (3d Cir. 2002); *AYR Composition, Inc. v. Rosenberg*, 261 N.J. Super. 495, 501 (App. Div. 1993). That duty obliges them not to prefer one creditor over another, and not to prefer themselves over creditors. *Foodtown*, 296 F.3d at 173. However, an individual Plaintiff cannot recover under such a legal theory on his own behalf. *Portage Insulated Pipe Co. v. Costanzo*, 114 N.J. Super. 164, 167 (App. Div. 1971). The

Plaintiff must file the lawsuit on behalf of all creditors. *Id.* The reason for this rule is that a recovery which only satisfied the Plaintiff's individual debt would be tantamount to the court ordering the defendant to violate the same fiduciary duty to other unpaid creditors who did not take part in the lawsuit. *See id.*; *Central-Penn National Bank v. N. J. Fidelity & Plate Glass Ins. Co.*, 119 N.J.Eq. 265, 271-72 (Ch. 1935). Accordingly, the Court will dismiss this cause of action.

### D. Negligent Misrepresentation

The elements of a negligent misrepresentation claim are (1) a special relationship; (2) an incorrect statement, (3) negligently made, and (4) justifiably relied upon; (5) damages for economic loss (6) sustained as a consequence of that reliance. *See Kaufman v. i-Stat Corp.*, 165 N.J. 94, 109 (2000); *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 975 F. Supp. 584, 619 (D.N.J. 1996), *rev'd on other grounds*, 133 F.3d 225 (3d Cir.), *cert. denied*, 525 U.S. 817 (1998). The scope of claims coverable under a negligent misrepresentation cause of action is small in order to avoid potentially unlimited liability. *Kaufman v. i-Stat Corp.*, 165 N.J. at 102.

For the purposes of this case, the principal distinction between a fraud claim and a negligent misrepresentation claim is the special relationship element. *Torsiello v. Strobeck*, 955 F. Supp. 2d 300, 316 (D.N.J. 2013) (*citing In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 975 F. Supp. 584, 619 (D.N.J. 1996)). A "special relationship" in the negligent misrepresentation context is one that "implies a closer degree of trust than the ordinary buyer-seller relationship." *Pappas v. Harrow Stores, Inc.*, 140 A.D.2d 501, 504 (N.Y. App. Div. 1988). In the absence of some special relationship, there is no duty for a corporation "to volunteer information that might chill a supplier's willingness to extend credit." *Van Dam Egg Co. v. Allendale Farms, Inc.*, 199 N.J. Super. 452, 457-58 (App. Div. 1985) (*citing Allesandra v. Gross*, 187 N.J. Super. 96 (App. Div. 1982)). The rationale for the "special relationship" requirement in the commercial context is that:

> [S]ellers of goods on credit to a corporation know they are dealing with an entity with limited resources whose form of organization ordinarily shields its principals from liability for its debts. There are a variety of ways to check the corporation's creditworthiness, including formal credit investigations, bank references and periodic statements of financial condition. In case of doubt, personal guarantees or other security can be demanded.

*Van Dam Egg Co.*, 199 N.J. Super. at 457.  A special relationship, for the purposes of negligent misrepresentation, could derive from privity of contract.  *H. Rosenblum, Inc. v. Adler*, 93 N.J. 324, 336 (1983) (*citing Immerman v. Ostertag*, 83 N.J. Super. 364 (Law Div. 1964)).  It may also arise where the public could reasonably rely upon the defendant's misstatements.  *Id.*

Plaintiff has produced no evidence of a special relationship, nor does he argue how the law might recognize a special relationship on the evidence produced.  While New Jersey Courts have expanded the use of negligent misrepresentation where it was sound public policy to do so; *see H. Rosenblum*, 93 N.J. at 329, 338-39, here, it is not.[6]  This was an ordinary buyer-seller relationship, and to the extent that Cevdet Aksüt relied on incorrect statements, it could be made whole pursuant to a fraud theory, but a negligent misrepresentation theory is not proper.

### E. Unjust Enrichment

"Unjust enrichment is not an independent theory of liability, but is the basis for a claim of quasi-contractual liability."  *Nat'l Amusements, Inc. v. New Jersey Tpk. Auth.*, 261 N.J. Super. 468, 478 (Ch. Div. 1992) *aff'd*, 275 N.J. Super. 134 (App. Div. 1994).  Quasi-contracts or constructive contracts are "a class of obligations which are imposed or created by law without regard to the assent of the party bound, on the ground that they are dictated by reason and justice."  *Callano v. Oakwood Park Homes Corp.*, 91 N.J. Super. 105, 108 (App. Div. 1966). "They rest solely on a legal fiction and are not contract obligations at all in the true sense, for there is no agreement; but they are clothed with the semblance of contract for the purpose of the remedy, and the obligation arises not from consent, as in the case of true contracts, but from the law or natural equity."  *Id.*  To recover on a theory of quasi-contract, a plaintiff must prove that defendant received a benefit and that retention of the benefit without payment would be unjust.  *Id.*  Courts employ the fiction of quasi-contract with caution.  *Id.*

In this case, the application of quasi-contract is redundant to the other causes of action and dangerous to the interests of justice.  There are two solid theories of liability.  First, if Cavusoglu abused the corporate form in order to avoid a judgment or perpetrate a fraud, then he is personally liable for the *Cevdet Aksüt I* judgment.

---

[6] In *H. Rosenblum, Inc. v. Adler*, the New Jersey Supreme Court held, on public policy grounds, that plaintiffs who acquired stock in a publicly-traded corporation could bring an action for negligent misrepresentation against an accounting firm that had audited the corporation's financial statements inaccurately.  The Legislature did not agree that this was a good policy.  It subsequently enacted N.J.S.A. 2A:53A-25 to eliminate the duty of accountants to third parties not in privity.  *E. Dickerson & Son, Inc. v. Ernst & Young, LLP*, 179 N.J. 500, 504 (2004).

Second, if he made intentionally false representations about his creditworthiness in order to induce Cevdet Aksüt to ship him goods on credit, then he could be liable for fraud.

Expanding liability into the realm of quasi-contract unfairly invites the jury to give Cevdet Aksüt after-the-fact insurance on a risky business decision. Cevdet Aksüt knew or should have known it was taking a big risk when it sent $1.1 million of merchandise to a relatively unknown foreign importer without collateral, cash against documents, or letters of credit. The soft belly of a quasi-contract claim could too easily invite a jury to unfairly subsidize the consequences of Cevdet Aksüt's risky behavior. Therefore, the Court will grant Defendant's Cross-Motion for Summary Judgment with respect to this count of the Complaint.

### F. Conversion

The Court will grant Defendant's motion for summary judgment on the conversion claim. "The crux of conversion is wrongful exercise of dominion or control over property of another without authorization and to the exclusion of the owner's rights in that property." *Chicago Title Ins. Co. v. Ellis*, 409 N.J. Super. 444, 456 (App. Div. 2009). An action for conversion does not lie where there is a debtor-creditor relationship between the parties. *Advanced Enterprise Recycling, Inc. v. Bercaw*, 376 N.J. Super. 153, 161 (App. Div. 2005). "Where there is no obligation to return the identical money, but only a relationship of a debtor and creditor, an action for conversion of the funds representing the indebtedness will not lie against the debtor." *Id.*

Plaintiff's theory of conversion is too creative. Cavusoglu did not take possession of Plaintiff's goods without Plaintiff's authorization. Plaintiff knowingly shipped the goods to Cavusoglu with the expectation that he would pay Plaintiff in cash for the value of the goods. It is essentially a debtor-creditor relationship, and to the extent that Cavusoglu never intended to pay Plaintiff for the goods, the rightful remedy lies in a fraud claim, not conversion.

## IV.  CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Summary Judgment is denied, and Defendant's Cross-Motion for Summary Judgment is granted in part. The claims for breach of fiduciary duty, negligent misrepresentation, unjust enrichment, and conversion will be dismissed. An appropriate order follows.

15

/s/ William J. Martini

_____
**WILLIAM J. MARTINI, U.S.D.J.**

**Date: July 14, 2015**